UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
**-------------------------------------------------------------------- X**

ANTONIETTA ZAPPIER,                                Case No. 22-cv-06709 (PMH)

                          Plaintiff,                 **COMPLAINT**

                -against-                   **JURY TRIAL DEMANDED**

PROJECT VERITAS and MICHAEL SPADONE,

                       Defendants.

**-------------------------------------------------------------------- X**

       Plaintiff Antonietta Zappier by her attorneys, Advocates for Justice, Chartered Attorneys, for her complaint against Defendants Project Veritas ("PV") and Michael Spadone ("Defendant Spadone" or "Spadone"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.     This is an employment discrimination action for injunctive and monetary relief brought by a 61-year-old woman, Antonietta Zappier, who was employed and then terminated by Defendant Project Veritas. This suit is brought, in part, to remedy Plaintiff's two and a half years of work in a sexually hostile work environment, which ended after she was sexually assaulted and sexually harassed by PV's Field Director, Michael Spadone, and to remedy the fact that she was terminated by PV and Spadone because she rejected Spadone's entreaties to spend the weekend with him at his home for a sexual liaison. It is also brought to remedy PV's retaliation against her (a lawsuit) for exercising her rights under the Older Worker Benefit Protection Act ("OWBPA"), to opt-out of a separation agreement, through counsel.

## JURISDICTION AND VENUE

2.      The jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, and

42 U.S.C. § 2000e-5. This Court's pendent jurisdiction is also invoked for claims brought under

New York State and New York City law pursuant to 28 U.S.C. § 1367(a).

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because

all the Defendants do business in this District, and because the causes of action arose, and the

acts and omissions complained of occurred in this District.

## PARTIES

4.      Plaintiff was employed by Defendant as an "administrative assistant" since

September 23, 2019, until on or about March 30, 2022.

5.      Plaintiff was at all relevant times an "employee" within the meaning of 42 U.S.C.

§2000e(f), 29 USC §630(f) (the Age Discrimination in Employment Act or "ADEA") and

Section 292 of the New York State Human Rights Law (hereinafter the "NYSHRL").

6.      Defendant Project Veritas ("PV") is a Virginia nonstock, nonprofit corporation

with its principal place of business in Mamaroneck, New York. PV is an organization recognized

as exempt from federal taxation as a charitable and educational organization under section

501(c)(3) of the Internal Revenue Code of 1986 as amended. Project Veritas is a right-wing

nonprofit organization, which has become notorious for attempted undercover "sting" operations

aimed at progressive organizations and Democratic Party campaigns and committees.

7.      The modus operandi of Project Veritas is to gain access to the offices of these

organizations and campaigns through fraudulent misrepresentation; then to secretly videotape

conversations and interactions with personnel of the organizations and campaigns; then to

selectively edit the videotapes so as to distort and misrepresent what was said, and then to

publicly release those selectively edited portions of the videotapes. The gross volume of Defendant PV's operations exceeds $22,000,000 annually.

8.      Defendant PV is an "employer" within the meaning of 42 U.S.C.§ 2000e, 29 USC § 630, and the New York State Human Rights Law § 292.

9.      Defendant Michael Spadone, who is sued as an "employer" and as someone who "aided and abetted discrimination" under the NYSHRL, is a 37-year-old resident of New Jersey, who holds the title at PV of "Field Director." His job is to recruit, train and supervise "undercover" journalists and facilitate their operations, and at times actively participate in their "field work."

## PROCEDURAL HISTORY

10.     Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging age and sex discrimination against her employer, PV, and also alleging retaliation.

## STATEMENT OF FACTS

11.     On September 23, 2019, Plaintiff was hired by PV with the title Administrative Assistant. She was mission driven, on call seven (7) days a week. She was hired to work 40 hours a week but would put in an average of 60 hours a week. Plaintiff was one of the oldest employees at PV, a company where most of the employees are in their 20s-30s. She worked while on vacation, came into headquarters against doctor's orders after two major surgeries and worked from home during every holiday. She was also one (1) of two (2) employees who came into work during the height of the 2020 Covid shutdown and received a Moving Mountains Award for doing that.

12.     Plaintiff came to understand, and worked to advance, the mission of PV, and tolerated an atmosphere of sexual harassment of many female employees, until she was sexually assaulted by Field Director, and Defendant, Michael Spadone at a PV Christmas Party on December 17, 2021. At that Christmas party Michael Spadone, who was highly intoxicated and high on marijuana, for the first time engaged in physical sexual assault (prior to the party, it was always verbal flirtation). His advances continued to escalate in late March 2021, when Spadone invited Plaintiff to spend time at his house, for what was understood to be a sexual liaison, and stated he was never alone on a weekend. Plaintiff, however, declined Spadone's invitation. That week she had received a positive employment evaluation and a raise. Almost one week later Plaintiff was fired for pretextual reasons.

13.     Plaintiff was a very dedicated employee and did many personal favors for James O'Keefe, the Chief Executive Officer, that were not related to her job description or the operations of PV; during her time at PV, she felt pressured to be on call 24/7 for CEO O'Keefe. She tolerated being woken out of bed by work phone calls and driving to headquarters on no notice at night in her pajamas in order to bring O'Keefe copies of his apartment key (since he frequently lost his keys). Plaintiff did so despite feeling unsafe at headquarters, arriving alone, with no security at these hours, because O'Keefe often received death threats. O'Keefe also often lost numerous car keys, his cell phone, his laptop, and other personal items, which Plaintiff was sent to retrieve. Plaintiff also ran personal errands for O'Keefe on company time, managing his parking tickets, paying his boat slip at the local marina, arranging his dry cleaning, doing his laundry if necessary, and arranging the cleaning of his apartment. Plaintiff was also tasked with purchasing food and liquor for O'Keefe's personal boat outings, once having to purchase hundreds of dollars of liquor when O'Keefe hosted the NY Young Republicans. At that event

party goers defecated on the floor of the boat, and Plaintiff had to run and buy cleaning supplies. Additionally, Plaintiff signed O'Keefe's signature on thousands of books to donors who contributed a minimum of $200.00 for an autographed book; Plaintiff was told that this was part of her job.

14.     Spadone's flirtation with Plaintiff began in early 2021when he became a member of Field Operations leadership and started coming with greater frequency to headquarters. He often complimented Plaintiff's appearance, always smiled at her from across the room, many times calling out, "Hey gorgeous," and time and again giving her an uncomfortable nudge as he walked by her. On one occasion in the kitchen area, Plaintiff bent down to pick up a dropped spoon and Spadone said, "Oh come on, don't do that to me!"

15.     Spadone's flirtation became sexual assault on December 17, 2021, at the Project Veritas Christmas Party. At around 10 p.m., Spadone, who appeared to be highly intoxicated and high on marijuana, and who was very sweaty, came from out of nowhere onto the dancefloor and forced himself on Plaintiff. He put his hands around her waist, began bear hugging her, kissing her neck, loudly shouted into her ear that she was "so fuckin hot" and worked his way up to her lips, while she resisted. It took two men (Angelo Martinez and Jake Mantel) to pull Spadone off of Plaintiff. Martinez screamed "Yo, get off of her, man!" Journalist Robert Harr (a/k/a "Lithium"), who reports directly to Spadone, came up to Zappier at the holiday party later and said, "I can't believe Jitsu [Spadone's undercover name] was all over you!" Plaintiff immediately described the incident to former editor Nick Gioia (he was seated at a table at the party) and told him what had happened. Nick expressed shock and said, "WTF"?

16.     Plaintiff, who was extremely upset, discussed the incident with, or in front of PV employees and former employees Michael Villani, Fredy Mfuko (a manager), Kalen Erikson,

5

Anthony Wray, Derek Chung, Nick Gioia, Andrew Riley, Gavin Elwes, Michael Juarez, Alejandro Lora, Matthew Wermes, Stephanie Jablonsky, and others. Those employees who commented (except Mfuko) found the incident amusing. But Plaintiff did not report the incident to Human Resources because based on her experience, the head of Human Resources, Jen Kiyak, would not address the situation appropriately and would instead report the complaint to CEO O'Keefe, which would jeopardize Plaintiff's job since Spadone was a Director most favored by CEO O'Keefe. (Spadone even had his rent paid by PV). O'Keefe blatantly played favorites at the office, yet often could not even remember Plaintiff's name despite having to walk past her desk to his office every day (calling her "Vanessa" a few times). Ms. Kiyak, upon information and belief, knew many supervisory employees were sexually involved with subordinates, and that drinking on the job and drug use during the workdays and nights was rampant. When a sexual relationship was made known to her, her frequent response would be, "I can't control who has sex with who."

17.     Upon returning to work, not only did Spadone fail to apologize to Plaintiff for his actions, his solicitations of Plaintiff only escalated.

18.     On the morning of Thursday, March 24, 2022, Spadone yelled from his office, "Hey gorgeous, come in my office." The head of investigative Journalism/Call Center Director, Thomas Scuccimarra, who was with Spadone in his office and witnessed him yelling, replied "Do you both need a room?" and then left, after perceiving the inappropriate romantic undertones in Spadone's solicitation. Scuccimarra leaving Plaintiff alone with Spadone made her uncomfortable. Spadone then asked Plaintiff if she wanted to see pictures on his phone of his house overlooking the Delaware River. Plaintiff complimented his place and then immediately Spadone said, "How would you like to come over sometime." Plaintiff replied, "No thanks." He

then said, "You know I'm never alone on the weekends." Plaintiff took this as an invitation to a sexual liaison and was shocked, uncomfortable, and could not think of any other response other than "Good for you." In prior conversations with Spadone, Plaintiff had made it clear to Spadone that she was happily married and had no interest in him sexually. In one conversation (prior to the holiday party), when Spadone was coming onto her, Plaintiff got uncomfortable and tried to deter his advances by saying, "You know my husband's a maniac, right?" (i.e., extremely jealous). Spadone's response was, "I'm not scared" and referred to his supposed black belt in jiu jitsu (hence his PV code name: "Jitsu.")

19.     On the morning of March 30, 2022, a PV "undercover" journalist named Bradley Barkowski (aka, "Jasper") called Plaintiff at home, at 6:30 a.m. He had just arrived and needed a shower because he would not be able to check into the hotel Plaintiff booked for him until noon and wanted to be presentable to come into the office that morning. Plaintiff (who felt obligated/pressured to over-extend herself, due to her age, at a company where most staff were much younger than her) informed Barkowski that a shower would not be a problem, and that he could use the shower at her house which was only a few minutes away from the office. While he was in the Uber en route to her house, Plaintiff informed her husband, Vincent Zappier, that a male "undercover" journalist was coming to take a shower. He was not happy about that arrangement. He had only slept three hours that night. She also knew that Vincent was annoyed with the degree to which Plaintiff over-extended herself for PV, and believed that PV did not appreciate her. Additionally, Plaintiff and Vincent kept a storage pod with company merchandise and equipment for months in their driveway after the office was flooded, to save the company storage facility fees. Vincent Zappier felt that PV and O'Keefe never appreciated anything Plaintiff did for him or the company.

20.     Vincent (who is a lawful gun owner) also was not comfortable with a journalist being at their home since PV's offices had recently been raided by the FBI, and Vincent was not comfortable with a male employee in general being at their home, especially to use their shower. Barkowski entered the Zappier house and Vincent asked Barkowski several times to leave. Plaintiff argued that he only needed a shower and that it was not a big deal. Vincent Zappier again asked Barkowski to leave, and again, Barkowski did not leave or even acknowledge Mr. Zappier. He proceeded to walk into the bathroom and take off his shoes to step into the shower. Mr. Zappier went upstairs to retrieve his gun. He came back down after Barkowski closed the bathroom door and proceeded to tell Barkowski he had a weapon holstered on him and that he needed to leave the house. At that time, Plaintiff knocked on the bathroom door and told Barkowski they needed to leave immediately, which they did.

21.     Plaintiff drove immediately to PV headquarters. Kiyak (who Plaintiff had called) called Plaintiff back during the car ride and Plaintiff explained to Kiyak what had happened. Kiyak asked to speak to Barkowski and asked him if he wanted to press charges. Barkowski insisted he did not want to press charges and that everything was just a misunderstanding, and that Plaintiff was only trying to extend him a courtesy. Plaintiff then called Barkowski's direct supervisor, Spadone, and very briefly informed him what had happened, saying "There was an incident at my house between my husband and [Barkowski] involving a gun but nothing happened, and no one was hurt and we're on our way to the office now." Spadone's reaction was strange. He hesitated on the phone and then responded by saying "Oh shit, I gotta go." It was not clear whether he of knew Barkowski's whereabouts or travel arrangements, which is part of his job responsibilities. He did not ask for details and did not call Barkowski directly while he was in the car, nor, upon information and belief, did he speak to Barkowski when he got to the office.

Barkowski insisted that he did not want to utter a word of the event at the office and was trying to calm Plaintiff down and reassure her. He did not attribute any blame or animosity to Plaintiff for the misunderstanding. Plaintiff was very upset about the misunderstanding when she arrived at 7:30 a.m. At 9:30 a.m., as she approached the kitchen, everyone in the kitchen knew about what happened. Jake Mantel, video editor, and witness to the Christmas party incident, who had been to several dinners at Plaintiff's house and knew Vincent Zappier, approached her, and said "Yo! Your husband's a gangsta!!!" and fist-pounded Plaintiff.

22.     Several hours later, Plaintiff was called into the conference room with Jen Kiyak, Jered Ede (Chief Legal Officer), and Tom O'Hara (Chief Finance Officer). Spadone was not present. Ede, who was usually friendly, had a cold, stern look on his face and barely made eye contact with her the entire time. O'Hara looked upset; he and Plaintiff had a friendly working relationship. Kiyak did most of the talking , and seemed to be on the verge of tears. She stated that there was an inappropriate voicemail from Plaintiff that surfaced on the Internet and that they had to terminate her employment because of it. Kiyak proceeded to play the voicemail on her phone. It was a PowerPoint presentation an unnamed female made on why James O'Keefe was a "massive asshole," and one of the slides said, "And he has employees like this lovely lady working for him" with an audio attachment of Plaintiff returning her call and leaving a sarcastic voicemail. Plaintiff barely remembered this exchange as it had happened a year earlier, but from what she recalled, the woman who produced the Power Point called the office frequently simply to harass them and mouth off about how much she hated PV and O'Keefe. One day Plaintiff got annoyed, returned a call and left the sarcastic voicemail. No reference was made by Kiyak to the gun incident involving Mr. Zappier as grounds for termination.

23.     After her termination, Plaintiff tried for days to find this voicemail/PowerPoint online and could not. It had been initially posted a year earlier and was now buried deep in Google search results. Since this PowerPoint was not something easily locatable online, it was something Plaintiff had good reason to believe was sourced from Spadone's department ("Field Ops") since his department did routine internet searches of the company and its employees. The voicemail was never referenced in any past employment review, including the one Plaintiff had had one week prior. There was no reason stated about why the voicemail message incident was being addressed on March 30, 2022. No one in the conference room had uttered a word about the gun incident.

24.     The PowerPoint was clearly pretextual and the discovery of this tape would indicate that Spadone was involved in the termination discussion since it would have been his department that had to supply the voicemail that was used to fire her. Nevertheless, Spadone was the one to escort her out of the building. All he could say is "I'm so sorry about all of this." She was in total shock and could barely process what was happening. And she was confused as to why Spadone was escorting her out to her car.

25.     Before Plaintiff was walked out of the termination meeting on March 30, 2021, she was handed a previously prepared Separation Agreement which gave her $7500 in return for a release of claims under a number of laws, some of which were stated, and all others included in the phrase "or any other state, federal or local statutes or laws." Although the Age Discrimination in Employment Act ("ADEA") was not included in the release by name, it was included in this "any other" phrase. Plaintiff, still in shock over the events of the day, including her termination, and without being given time to consult a lawyer, signed the agreement without reviewing it; in fact, in her state of mind such review would not have been possible. At no time

10

was she given an opportunity to consult a lawyer, nor was she told that she had a right to revoke the agreement.

26.     After leaving the PV office, it began to dawn on Plaintiff that less than a week earlier she had turned down Spadone's sexual advances, and that this was Spadone's payback. She texted Spadone, saying "I know you had everything to do with getting me fired. I'm confused, I thought we were good?" He responded, "I had absolutely nothing to do with getting you fired., I was told right before they did it.. I am very upset with  what happened." Plaintiff responded: How did they get that video?" Spadone replied" I don't know (sic) and I haven't seen it yet." A few days later, Plaintiff heard from other employees that Spadone was bragging to employees that he fired her because she sexually harassed him. Plaintiff was offended and outraged. It also confirmed Plaintiff's belief that Spadone caused her termination.

27.     Two prior conversations Spadone had with Plaintiff began to haunt her. The first was after Vanessa Keverkamp, former COO, sent a very cryptic resignation email that confused Plaintiff, and upon information and belief, many other employees. Spadone privately told Plaintiff, "You can thank me for getting rid of her. It was either me or her that would go. And the company will never choose her over me." Plaintiff later heard from a few employees that management confronted Keverkamp and asked her to resign, on pretextual grounds, saying that Spadone accused Keverkamp of inappropriate sexual behavior towards him. Keverkamp had a reputation for being "very professional" in contrast to her work environment and was not very warm and approachable, so the allegation was not believable. Plaintiff was told that Keverkamp believed that her termination was actually due to her complaining to the Board of Directors that James O'Keefe spent half a million dollars on a party to promote his book.

28.     The second conversation was a comment Spadone made to another PV employee after a journalist, Alicia Powe Juub's ("Pebbles"), termination was publicly announced to the company. Spadone told one or more employees "I had to get rid of her. She was high all the time." Plaintiff later heard from other employees, and Juub, that Spadone had an openly flirtatious relationship with Juub that was not reciprocated.

29.     Juub told Plaintiff, after Plaintiff's termination, that she heard from other employees that Spadone was telling people that "I could stare at those tits all day" (referring to Juub's breasts). Upon information and belief, Spadone repeated this statement to other members of leadership. Juub informed Plaintiff that Spadone always flirted with her, which annoyed her. She also advised Plaintiff that another "undercover" journalist, Anthony Wray (aka "Naz") informed Juub that Spadone bragged to him (Wray) that Plaintiff was terminated for sexually harassing Spadone.

30.     Clearly, there is a pattern with Spadone bragging about terminating women, such as Plaintiff, when unreciprocated sexual advances occurred, or when he otherwise found it convenient to falsely allege sexual harassment of him, by a female employee, as a pretextural reason for an otherwise non-legitimate termination.

31.     During a staff training event in 2019, Plaintiff was responsible for ordering both the book and movie, "Red Sparrow," a project James O'Keefe mandated for all the undercover journalists to complete by reviewing both. This book/movie are based on a female Russian intelligence officer who is trained in "sexpionage" and then sent to make contact with a CIA officer in the hope of identifying a mole. Red Sparrow contains very explicit sex and violence, including two rape scenes. The book/movie celebrates the use and abuse of the female body to obtain information. It was never stated why O'Keefe thought this was necessary or appropriate

for his journalists to watch. However, Plaintiff heard that female journalists, like past journalist Laura Loomer, used to openly brag that she could "get any content "she needed when she "could get the target on his back"; upon information and belief James O'Keefe encouraged this behavior.

32.     December 16, 2021, James O'Keefe called an "All Hands" staff meeting in which he spoke about "Tinder Operations" needing "hot, older women on Tinder," and then made reference to Plaintiff and head of HR, Jen Kiyak. This was videotaped at the Sonesta Hotel in White Plains, NY. Due to Kiyak's reaction, it appeared that she was quite uncomfortable with the comment; nevertheless, Kiyak never asked Plaintiff how she felt about the comment nor did Kiyak discuss it with her.it with her.

33.     Younger male employees frequently flirted with and solicited Plaintiff. On one occasion a twenty-something-year-old male employee said to Plaintiff, "You're old, but I would still fuck you"! Plaintiff was shocked and had to walk away.

34.     On one morning summer of 2021, Plaintiff and Asha Bolton (James O'Keefe's Executive Assistant) had to retrieve merchandise for an upcoming event, from a building which was located next to headquarters (115 Hoyt Avenue) and they both saw Spadone come out of the shower with just a towel around him. No one else was in the office. The walls are very thin, and the bathroom is right next to the entrance door, so Plaintiff has every reason to believe that Spadone heard two female voices and knowingly, purposely, walked out of the bathroom with nothing but a towel covering his groin, parading around shirtless. He proceeded to make conversation with Plaintiff and Ms. Bolton like it was nothing. Ms. Bolton was clearly embarrassed and could hardly look at Spadone.

35.     Other examples of the highly sexualized nature of the PV workplace, and the hostile work environment which Plaintiff had to endure, include the following: (the examples below are stated upon information and belief because except where indicated the information was learned through discussions with other employees):

a.     James O'Keefe gave instructions to investigative journalists Michael Juarez and Head of Insiders Dept. Spencer Meads to flag private messages on his personal social media accounts from attractive women so he could respond to them personally.

b.     James O'Keefe instructed those doing the hiring that he wanted young, attractive female journalists to be hired to go on undercover dates—coming to headquarters dressed provocatively. O'Keefe openly referred to these employees as "PYTs" (pretty young things).

c.     PV encouraged a culture of employees sleeping with each other, and constantly drinking, using drugs, and partying together.

d.     A former Department Manager had an openly romantic relationship with a subordinate. They would disappear together frequently during the daytime. PV did nothing to stop the relationship until O'Keefe suspected that the Department Manager had leaked proprietary donor information to a journalist. O'Keefe then conducted a companywide shakedown involving private investigators and lie detector tests. Only then did the subordinate resign and the Manager follow suit. Upon information and belief, Austin Wright, PV's main fundraiser, had previously gotten the subordinate pregnant and paid for her abortion. James O'Keefe, upon information and belief, was informed about the abortion, and although Wright remained a managerial employee, no remedial action that staff was told about was taken.

14

e.      Most of 2020 and until the Fall of 2021, PV rented an apartment at the Mason Apartments in Mamaroneck, NY. The lease, upon information and belief, was signed in Jennifer Kiyak's name. This "corporate" apartment was used as a "frat house" for drinking, sex, marijuana, and parties—James O'Keefe participated on occasion. Upon information and belief, on one occasion in early 2021, an "undercover" journalist nearly died of a drug overdose. His direct supervisor at the time questioned people who were there during the incident, among them was Eric Spracklen, current Chief of Staff, who was an eyewitness.

f.      Upon information and belief, O'Keefe bragged to employees of PV that he recorded his private, personal, and sensitive conversations with his ex-girlfriend in the conservative movement, Turning Point Contributor and Newsmax Contributor, Morgan Zegers, without her knowledge, even though the recordings were made in a two-party consent state. He shared the recordings with other employees, despite the fact that they contained very private information about his and Ms. Zegers' sexual activities.

g.      Upon information and belief Chief Legal Officer Jered Ede reprimanded the in-house counsel Stephanie Jablonsky for complaining about provocative work attire of aformer Executive Producer, attire which exposed her breasts. Jablonsky was fired after attempting to document complaints about a superior having an inappropriate sexual relationship with a much younger subordinate, engaging in sexual activity in the office, repeated workplace intoxication, leaving the office to drink at a local bar during work hours for many hours at a stretch, and purchasing alcohol for personal consumption using a company credit card. Upon information and belief Ede actively instructed other managers to disregard Jablonsky's complaints and later advocated for her termination. Upon information and belief Jablonsky was reprimanded by James O'Keefe for taking a screenshot of the employee drinking in the PV

conference room, and accused her of "spying on her colleagues." O'Keefe stated "Humans gonna be human." He added, "The NY Times would not care about my employees having sex in the office! They would care about employees spying on other employees." Upon information and belief, after Jablonsky's termination another employee called her and attempted to get her to make statements which would embarrass her. Subsequently. Ede called a company-wide meeting and threatened to terminate any employees who knew that Jablonsky was documenting the allegations, stating that employees had an obligation to notify management of insubordination, and that failure to do so was a failure warranting termination. He stated that what Ms. Jablonsky did was wrong, that there would be no tolerance for disagreement on this issue, and that any employee who disagreed had no place at the company and would be swiftly terminated. He told employees that Ms. Jablonsky had "gone rogue" because she was documenting human resources violations without any authority to do so. He then terminated one of Ms. Jablonsky's close friends. Many employees were asked to sign a Non-Disclosure Agreement, with a $2 million penalty clause, if they discussed what was said at the meeting. A day or two after Jablonsky's termination, PV sent out a document detailing the Company's "Core Values" and stated that employees who did not uphold "Core Values," would "fail miserably." Plaintiff took this to mean that sexual harassment complaints would not be tolerated.

       h.    Plaintiff personally witnessed Spadone flirting with the HR Director, Jennifer Kiyak, along with numerous women. He once made a comment to Jen Kiyak, who was carrying her monthly case of wine to her office, that "Pretty girls should not be carrying boxes." Kiyak always smiled when he flirted and appeared to welcome his flirtations.

       i.    Jamie Phillips (aka "Magnolia"), an executive employee who was heavily involved in the recruitment of Spadone and supervised him on his training assignments, openly

referred to him as "the Hot Guy." She had sex with Spadone at some point during his training and or onboarding process, which he bragged about. Upon information and belief, this eventually became known to many undercover journalists and staff at headquarters, including HR Director Jen Kiyak, who, after Spadone bragged to other male undercover journalists that he had sex with Phillips, and discussed intimate details, stated "I can't control who has sex with who at this company," and took no known remedial action.

      j.    James O'Keefe posted a picture on Instagram of a female named Jazmin Ivy Rodriguez, who had participated in creating a music video for PV (which O'Keefe danced in), where she was sitting in his office chair, in a dimly lit office, with O'Keefe standing over her shoulder, in which she wore suggestive clothing which appeared to be dominatrix-like.

      k.    Upon information and belief O'Keefe frequently denigrated female employees behind their backs to other employees about their looks, referring to one journalist as "a train," spoke about female employee's weight, and called one employee "Belle" because he said she was "shaped like the Liberty Bell." After the resignation of Vanessa Keverkamp (see Paragraph 27, above), he stated to a group of employees in the Production Department that he would never again hire a female Chief Operating Officer.

      l.    During a company-wide, in-person meeting, James O'Keefe was delivering a PowerPoint presentation on a projector screen attached to his work laptop. While James was talking, pornographic images could be seen in the background window. This background was visible for about 30 seconds to a full minute before the head of production, Fredy Mfuko, ran out of the Production Suite to James to tell him to minimize/close his screen. Most of the employees (out of a total of 75 employees) saw the porn and you could hear roaring

laughter throughout the entire office. Plaintiff also witnessed porn on James O'Keefe's work computer when he was out of office when she was placing something on his desk.

      m.    In a very well-publicized incident in 2010, which O'Keefe has tried to explain away, he planned to bring CNN reporter Abbie Boudreau onto a boat which, according to a document obtained by CNN, was set up as a "pleasure palace," on which he would attempt to seduce Ms. Boudreau on camera. The plan did not proceed because PV's Executive Director, Izzy Santa, intervened and warned Ms. Boudreau.

      n.    Later in 2010 Ms. Santa was terminated, and alleged that she was required by Mr. O'Keefe to accompany him to adult bookstores to purchase female sexual aids, was forced to allow Mr. O'Keefe to bathe at her apartment with no one else present, and was exposed to "numerous incidents of sexually provocative and potentially misogynistic comments and communications by Mr. O'Keefe and others.

      o.    According to Nadia Naffe, who worked for O'Keefe on an undercover project, targeting Congresswoman Maxine Waters, O'Keefe invited her to his home to plan some attack on an NYU journalism professor, who was investigating PV. O'Keefe, upset because Naffe was unreceptive to his sexual interest, drugged her, and forced her to spend the night in an unheated barn on his property where O'Keefe had filmed sexual activity with a girlfriend. O'Keefe followed up with personal attacks on Naffe, had an attorney threaten her if she reported what had happened to the police, posted a video on You Tube attacking Naffe, and then sued her. The allegations were made public by Naffe, online, which were responded to with a campaign of public humiliation.

    36.    Within days of her termination Plaintiff consulted counsel, who reviewed the Separation Agreement, and wrote to Jenifer Kiyak that "The severance agreement [Plaintiff]

signed is unlawful, and through us, she is exercising her rights under the Older Americans

Benefit Protection Act (OWBPA), 29 USC Section 621, to revoke her agreement. The severance

agreement violates the OWBPA in numerous respects. Most importantly, Ms. Plaintiff was not

given 21 days to consider the agreement and consult a lawyer, and she was not given 7 days to

revoke. In our view her severance package is far too meager, particularly given the sexual

harassment she experienced in recent days. Please either contact me, or have your attorney

contact me, to discuss an appropriate package."

37.     Plaintiff's counsel was contacted by counsel for PV and engaged in a discussion

about Plaintiff's sexual harassment claim and an increase in a separation package. On May 15,

2022, counsel for PV wrote to counsel for Plaintiff and stated that an "exceptionally thorough

investigation of Ms. Plaintiff's claims … has uncovered no evidence corroborating them."

However, the letter continued,

> Despite the foregoing, Project Veritas also recognizes that additional severance may still be the right thing to do for Ms. Zappier, for reasons entirely independent of her allegations. While Ms. Zappier was terminated for repeated and inexcusable misconduct—including making threats against Project Veritas' office neighbors over a parking space and accosting and harassing someone who called with a news tip—she was an integral part of the explosive growth at Project Veritas at a critical time. She was also a friend of many. Her termination was a difficult decision to make, and a painful loss for Project Veritas. Project Veritas has expressed (and permitted me to share with you) that it wishes Ms. Zappier had not engaged in that behavior, and that her employment could have continued for many years to come.
>
> Unfortunately, Ms. Zappier acted the way she chose to act, and left my client no other choice. It was in recognition of her service, her dedication to Project Veritas, and her friendship that Project Veritas paid Ms. Zappier 6 weeks 'severance, despite having no legal obligation to do so. Of course, recent events have not put Ms. Zappier in a positive light. Since Ms. Zappier attempted to renege on her original Separation Agreement, Project Veritas would be well within its rights to take legal action including, without limitation, seeking the return of the severance payments already made to her.

Additionally, your communications to me, as well as other information provided by witnesses has revealed that Ms. Zappier had been discussing confidential Project Veritas business with them, which is a clear breach of her Non-Disclosure Agreement, and which could also support legal action.

On the other hand, Project Veritas realizes that litigation would do nothing but harm Ms. Zappier further, and it has no desire to cause Ms. Zappier any difficulty. During her exit meeting, Ms. Zappier revealed certain personal troubles including, among other things, that her daughter had been sober but relapsed and was in rehab, which Ms. Zappier was funding. While Project Veritas does not condone the tactics that you and Ms. Zappier have employed in this matter, it also knows that Ms. Zappier may be hurting right now, and her behavior may be an act of desperation given her very difficult personal and financial situations.

In short, Project Veritas is willing to do something further to help her through this tough time in her life. With that in mind, and in further recognition of Ms. Zappier's almost three years of service to Project Veritas, and the personal struggles she mentioned at her termination, Project Veritas will agree to Ms. Zappier's request to provide her with 6 months' worth of severance, instead of the 6 weeks that she previously negotiated. A revised severance agreement will be sent to you next week for Ms. Zappier to execute. Ongoing payments of the original severance amount are scheduled. Upon signing the revised agreement, Ms. Zappier's ongoing payments will continue until such time that 6 months' worth of severance has been fully paid out.

38.     The parties were not able to work out an agreement, and over the next month counsel for PV continued to increase the sum PV was willing to pay Plaintiff. Then, on June 10, 2022, PV filed a lawsuit against Plaintiff alleging that she had breached her separation agreement because she had objected to the March 30, 2022, Settlement Agreement, through counsel as violative of the OWBPA and had alleged sexual harassment, and added a bogus allegation against Plaintiff's husband, Vincent Plaintiff, accusing him of harassing a PV employee. That lawsuit was coupled with a threat to seek a restraining order to seek enforcement of the March 30, 2022, settlement agreement and to bar Vincent Plaintiff from threatening PV employees.

39.     The lawsuit was entirely baseless and was designed to punish Plaintiff for alleging that she had experienced sexual harassment at PV, that her firing was an act of quid pro quo sexual harassment, and for asserting her rights under the OWBPA.

40.     Plaintiff incorporates the allegations above into each cause of action set forth below.

## AND AS FOR A FIRST CAUSE OF ACTION

41.     Defendants, individually and jointly, violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 *et seq.*, by discriminating against her on the basis of her gender. Plaintiff was required to work in and was the focus of a sexually hostile work environment, where women were demeaned, and were treated as though their principal value was their looks, their availability for sex with PV executives, or their ability to trade sex for either information or embarrassing statements from those PV was targeting for "investigation." Ultimately Plaintiff was fired for refusing the continued and escalating sexual advances of Defendant Spadone, whose mistreatment of women was condoned by PV.

## AND AS FOR A SECOND CAUSE OF ACTION

42.     Defendants, individually and jointly, violated Plaintiff's rights under Section 296 of the NY State Human Rights Law by discriminating against her on the basis of her gender. Plaintiff was required to work in and was the focus of a sexually hostile work environment, where women were demeaned, and were treated as though their principal value was their looks, their availability for sex with PV executives, or their ability to trade sex for either information or embarrassing statements from those PV was targeting for "investigation." Ultimately Plaintiff was fired for refusing the continued and escalating sexual advances of Spadone, whose mistreatment of women was condoned by PV.

### AND AS FOR A THIRD CAUSE OF ACTION

43.     Spadone PV violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* by retaliating against her through the institution of a baseless lawsuit, because she complained about discriminatory treatment, including, but not limited to sexual harassment by Spadone.

### AND AS FOR A FOURTH CAUSE OF ACTION

44.     Defendant PV violated Plaintiff's rights under Section 296 of the NY State Human Rights Law by retaliating against her through the institution of a baseless lawsuit, because she complained about discriminatory treatment, including, but not limited to sexual harassment by Spadone.

### AND AS FOR A FIFTH CAUSE OF ACTION

45.     Defendant PV violated Plaintiff's rights under the Americans with Disabilities Act, and more specifically, the Older Workers Benefit Protection Act, 29 USC Section 621, by retaliating against her through the institution of a baseless lawsuit, because she instructed counsel to revoke a Separation Agreement pursuant to the OWBPA, as was her right.

### DAMAGES

46.     As a direct result of Defendants' individual and/or concerted discriminatory actions and omissions against Plaintiff she suffered the ultimate adverse employment action, termination, and suffered a loss of pay and attendant employment benefits.

47.     As a direct and proximate result of Defendants' individual and/or concerted discriminatory actions and omissions, Plaintiff suffered severe emotional distress, with consequential physical illnesses.

48.     As a direct and proximate result of Defendants' individual and/or concerted discriminatory actions and omissions, Plaintiff's reputation was severely harmed causing personal injury including an inability to find employment.

49.     In acting as they did, Defendants acted maliciously and recklessly, entitling Plaintiff each to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff pray that this Court:

1.     Declare and adjudge that Defendant PV's employment policies, practices and/or procedures challenged herein are illegal and in violation of the Plaintiff' rights under Title VII, the New York State Human Rights Law, and the Age Discrimination in Employment Act.

2.     Enter judgment against Defendants, jointly and severally, awarding Plaintiff emotional distress damages in the sum of $2,000,000.

3.     Enter judgment against Defendants jointly and severally awarding Plaintiff punitive damages in the sum of $5,000,000.

4.     Enter judgment against Project veritas ordering Project Veritas to make Plaintiff whole Plaintiff by providing her with appropriate lost earnings and benefits, and other affirmative relief including front pay.

5.     Award litigation costs and expenses, including, but not limited to reasonable attorneys' fees, to Plaintiff.

6.     Grant Plaintiff such other and further relief as the Court deems proper and just.

## JURY DEMAND

Plaintiff hereby demands a jury trial.


Dated: New York, New York
August 7, 2022


ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
Attorneys for Plaintiff


By:_____ /s/ *Arthur Z. Schwartz*_____
Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400
aschwartz@afjlaw.com